" SELMA ROSNER ", Petitioner, *v.* " JACK G. ROSNER ", Respondent.*

Domestic Relations Court of the City of New York, Family Court, Queens County, November 26, 1951.

* Names used herein are fictitious for the purposes of publication.

*Seymour M. Litman* for petitioner.

*Gilbert Kanter* for respondent.

PANKEN, J.  Most judges are confronted with the task of resolving problems incident to situations testified to that are unique in character.  Courts are laboratories.  That is particularly true of the Domestic Relations Court of the City of New York.  Involved, novel, and unprecedented situations are submitted to the attention and for solution by the Justices of this court.  Not infrequently the testimony discloses conditions which have no precedent either in law books or in the compass of everyday life.  And the Justices of this court in discharge of their duties and obligations, in order to do justice between the parties, are required to resolve differences, disagreements, and unprecedented situations.

The parties herein were married on the 23rd of April, 1941.  The following year a child was born to them.  Both are intelligent human beings.  Both are of the Hebrew faith.  The respondent obviously is orthodox, a fundamentalist.

The uncontradicted testimony shows that the petitioner was deeply interested in social service work within the community of her religion.  Her activities in that respect required the expenditure of a considerable period of time from her home and child.  Her interests outside of the home, it appears, caused serious differences to arise between them.  Necessarily those activities impinge upon her time to the extent that the home in which the respondent and their child live was not altogether properly cared for.  Because of her absences from the home the respondent at times had to prepare his own meals.

" Keeping up with the Joneses " often inflicts irreparable harm in marital relationships.  Men and women will enviously compare their status with that of friends or acquaintances who are in a position to indulge in better homes, better clothes, more opportunities for pleasure, and in general, better surroundings.  That, it is evident from the testimony, the petitioner hungered for because of her contacts with people who were financially and socially better situated than she and her husband.

The respondent asserts that the petitioner did not observe the tenets of their religion.  One of the tenets of the Hebrew religion is " Kashruth ".  That requires the use of two distinct sets of dishes.  Strict observers of " Kashruth " will require four sets of dishes — two extra sets for the Passover holidays.  Another tenet of the Hebrew religion deals with the meat coming from animals which have been slaughtered according to

the Hebrew religion and only parts of it used for consumption by Hebrews.

Under the Constitution of the United States and that of the State of New York, religious freedom is guaranteed and under the term " religious freedom " is included the right to worship or not worship as one's conscience dictates, to observe or fail to observe the tenets of a religion one espouses as his conscience dictates. It is within the realm of probability that in the course of his life man takes different views of what his religion is to be, and whether he is to worship or not worship in response to the free exercise of his conscience. Were it otherwise, conversion to a new religion would not be recognized. Some turn from one concept of religion as taught by one group or another, to another, so that Hebrews become Christians and Christians go from one Protestant denomination to another, or accept the Hebrew faith. A Protestant may select the denomination he desires or his conscience wants him to, or even go from a Protestant denomination to become a Catholic or a Hebrew.

It is apparent from the testimony in this case that the petitioner has either changed or at least modified her idea as to what her religion required her to do with regard to " Kashruth ". Indeed, " Kashruth " is not observed alike by all Hebrews. It depends upon whether one follows what orthodoxy calls for or the conservative branch of Hebrew religious denomination, or what the reform Hebrew religionists call for. That is equally true among Protestants. Some are fundamentalist in their views; others have modified and interpreted what the fundamentalists regard as beyond the right of humans to change or modify. And so there are differences among Protestants as among Hebrews as to interpretation of the original religious ideas. Catholics now interpret the fundamentalists' basis as enunciated in the Testaments in the light of scientific advances. Creation is no longer fixed at a specific time.

The testimony in the case discloses that the petitioner had purchased non-Kosher meat. That testimony was not controverted by the petitioner nor explained. Insofar as orthodox Hebrew religionists are concerned the use of non-Kosher meat is a serious infraction upon their religious observances. While there is no proof as to the consequences of the use of non-Kosher meat, the court is aware that orthodox Hebrews would regard and do so regard it even a contamination of the dishes in which the objectionable meat was served. It is not for the court to express its opinion as to whether the extreme observance of

the religious tenet, usage or function is wise or not. It is there and those who follow the orthodox phase of the Hebrew religion may insist upon strict observance.

Differences between married people will arise because of change in attitude towards the religion they espoused at the time they were married. Man does not stand still and concepts of religious observances change. Sometimes the change is radical, a conversion from one to another religion, the substitution of one form of observance for another.

Where there was an understanding between the parties that religious observance would be of a particular character, both are bound by that understanding.

The situation, as the testimony discloses in this case, would have required the respondent, if he continued to live with his wife, to either purchase, prepare and cook his own food or eat away from home. Such a condition would react disastrously upon the emotional life not only of the partners to the marital relationship, but probably more so upon the child.

In *Garlock* v. *Garlock* (279 N. Y. 337, 340) the court said, "The marriage establishes a status which it is the policy of the State to maintain." The instrumentalities of the State, and all instrumentalities of the State are to serve the citizenry which in fact constitute the State. The State, the Government, and the people are one. One cannot exist without the other.

Whatever duties are imposed by law upon the persons who are parties to a marital relationship reflect social need and public policy. Duties are reciprocal in the marital relationship just as they are reciprocal in a larger sphere. Governments are reciprocal to the needs of the individual; the individual in turn is reciprocal in his duties to the Government, and each citizen has a reciprocal duty to his fellow citizens. It works both ways. And so, when the husband is prosperous, both prosper. When financial misfortune prevails, both share in the lesser fortune. The obligation of the husband is no greater than that of his wife. Each must contribute his share to maintain the status established by marriage.

In *Klein* v. *Klein* (87 N. Y. S. 2d 293) this court held that in proceedings in the Domestic Relations Court requiring a husband to support his spouse the uncontroverted testimony of the husband must be given credence though a shadow of exaggeration or doubt may fall on such testimony. And in that case the court said that she (the wife) has an interest not only insofar as receiving contribution to her support, but she also has an interest to maintain for herself the reputation that she

was a faithful, good and co-operative wife rather than a woman insensible and violative of the vows which she must have taken at the time of her marriage.

The petitioner is a very ambitious lady. In determining her rights in this proceeding the court does not cast any reflection upon her and the ambitions which animate her. The facts are that she is a high school graduate. Sometime in the summer of 1951 she was admitted to a university of our State to further her education. She is now the mother of a child past ten years. That, however, to her was not a factor which would militate against seeking fulfillment of her ambitions. It is her intention, and that fact has been established both from lips of the respondent and the petitioner that after she obtains from the university an academic degree she will pursue studies in medicine to be licensed as a physician. It would take four years for her to obtain her academic degree. It would take approximately six years before she would become entitled to obtain a license to practice medicine in this State. That, if there are no temporary failures on her part or interferences of one kind or another.

Attendance at the university involves expenditures both in time and in money. Attendance in medical schools will involve the expenditure of large sums of money and greater expenditure of time. The child will be deprived of care.

The respondent's gross earnings are about $4,400 per annum. On his earnings it would not be possible for him, were he so inclined, to meet the expenditures involved in her studies and the achievement of her ambitions.

There is no obligation on the part of a spouse to provide for his wife the funds which she requires to attain a professional status. The marital vows do not, in my judgment, include by implication such obligations. It is within the realm of probability and it might very well be proper for a husband to help his spouse in achieving what this petitioner desires. There is, however, no legal obligation to do so.

The child is rapidly reaching the teen-age period in her life. She needs her mother; her guidance, her care, her supervision. It is part of the duty of a mother as well as that of a father to provide for a child not only the physical needs, but also an atmosphere at home which will redound favorably to the growth emotionally, intellectually, and spiritually of the child.

In the circumstances as they have been testified to before me it would seem that the child would be deprived. The father has a right to expect the mother to give the child that which

is necessary for her development and good, as it is his duty to provide the means to effectuate that, both materially and in co-operation spiritually. There may be a moral obligation beyond that which the marital vows expressly or impliedly call for. Such an obligation, however, depends upon love and sympathy. The relationship between the parties must evoke such love and sympathy. When that because of differences goes by the board, the moral and ethical obligations fall with it.

The respondent had left his home, and the question to be determined is whether the situation existing in the home amounted to a constructive abandonment of him by his spouse or whether he did abandon her. From all of the facts in the case I cannot conclude otherwise, reluctant as that may be, that the husband was justified in leaving his home; that the petitioner herein had constructively abandoned her husband because of her abandonment of the duties and obligations which she owed him and the child; moreover, because of the fact that he could no longer partake of home life because of her abandonment of the religious tenets which they espoused at the time of their marriage.

Under the circumstances the respondent is required to contribute to the support of his wife and child the sum of $35 weekly, and an order to that effect is made to be effective until further order of the court. If the petitioner should in the future be able to earn her living or will earn the means of living, then the respondent may make an application for a modification of the order. In most cases a finding that the respondent is chargeable with the support of his wife on the basis of his means is just wishful thinking, for in most cases the orders made in this court are inadequate to meet even the needs of the dependents.